UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**JERRY D CHAVEZ**, and<br>**ANN MARIE CHAVEZ**,<br><br>Debtors. | Case No.  **07-60567-13** |

## *MEMORANDUM of DECISION*

At Butte in said District this 11th day of October, 2007.

In this Chapter 13 bankruptcy, after due notice, a hearing was held August 30, 2007, in Billings on confirmation of Debtors' Amended Chapter 13 Plan filed August 30, 2007.  The Chapter 13 Trustee, Robert G. Drummond of Great Falls, Montana, appeared at the hearing in opposition to confirmation of Debtors' Chapter 13 plan, while Debtors' attorney of record, Craig D. Martinson of Billings, Montana, appeared in support of confirmation of Debtors' Chapter 13 plan.  Debtor Jerry Chavez ("Jerry") testified in support of Debtors' Chapter 13 Plan and Debtors' Exhibits B and C were admitted into evidence.

At the hearing, Debtors' counsel referred to an amended Chapter 13 plan that called for monthly payments of $550.00.  Debtors' Amended Chapter 13 Plan filed August 30, 2007, only provides for monthly payments of $500.00.  Following the hearing, Debtors' counsel filed a Second Amended Chapter 13 Plan on August 31, 2007, which Plan provides for the monthly payments of $550.00 referenced by Debtors' counsel.  The post-hearing briefs filed by the Trustee and Debtors address Debtors' Second Amended Chapter 13 Plan, and thus, this Memorandum of Decision will address confirmation of such Plan, rather than Debtors' Amended

1

Chapter 13 Plan filed August 30, 2007.

## BACKGROUND

Jerry and Ann Marie Chavez, the Debtors, are married and live in Hardin, Big Horn County, Montana. Debtors filed their voluntary Chapter 13 bankruptcy petition on May 24, 2007, together with their Schedules, Statement of Financial Affairs, and Official Form 22C "Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income." Debtors list two dependents in their Schedules–sons ages 18 and 20. Debtors claimed only one of their sons as a dependent on their 2006 federal income tax return and Jerry testified that both sons are now in college and no longer live at home.

Jerry is a rural letter carrier with the United States Postal Service and Debtor Ann Marie Chavez ("Ann Marie") is a nurse employed by the Big Horn Hospital. On the original Schedules I and J filed with their bankruptcy petition, Debtors reported their combined monthly gross income as $6,887.14 and reported their monthly expenses as $4,613.34.

On the Form 22C filed May 24, 2007, Debtors checked the boxes on the top of the first page indicating that their applicable commitment period is 5 years and that their disposable income is determined under 11 U.S.C. § 1325(b)(3). Debtors report their combined "currently monthly income for § 1325(b)(3)" as $7,131.39. At Part III "Application of § 1325(b)(3) for Determining Disposable Income", Debtors disclose at Line 21 that their annualized current monthly income of $85,576.68 exceeds the applicable median family income for a family of four in the amount $55,641.00 as determined at www.usdoj.gov/ust.

Debtors own the home in which they reside, which is valued by Debtors as $120,000.00. Debtors' Schedules reflect that Debtors' home is fully encumbered. Debtors also own two motor

2

vehicles; a 1995 Chevy Blazer and a 1999 Chevy Truck (1500).  In their original Schedule B filed with their petition, Debtors disclosed an interest in an "AMERIPRISE/IRA" valued at $4,854.34 and also disclosed on line 21 of Schedule B: "ANGELINE MARALDO (AUNT PASSED AWAY NOV. 2006) ANN MARIE IS LISTED IN WILL; AMOUNT THAT SHE IS ENTITLED TO IS UNKNOWN".  On Schedule C, Debtors did not claim an exemption in the inheritance, but did claim an exemption of $4,854.34 in the AMERIPRISE/IRA.  On July 3, 2007, Debtors' amended Schedule B to disclose the value of "AMERIPRISE/IRA and TSC (valued as of 3/15/2007)" as $8,999.09.  Debtors made no change to the inheritance.  Debtors once again amended their Schedule B on August 29, 2007, to reflect a receivable due from Debt Relief USA in the amount of $3,400.00 and to reflect the value of Debtor Ann Marie Chavez' ("Ann Marie") inheritance from her aunt as $10,000.00.

With respect to the payments made to Debt Relief USA, Jerry testified that Debtors' debt is primarily credit card debt that has been incurred over the past 15 years.  Debtors' Schedule F lists $133,418.24 in unsecured debt.  Debtors contacted Debt Relief USA in July of 2006 and entered into an agreement with Debt Relief USA whereby Debtors were to pay Debt Relief USA the sum of $1,200.00 per month and in exchange Debt Relief USA would settle Debtors' credit card obligations.  As a result of the agreement with Debt Relief USA, Debtors were advised to not make any further credit card payments.

Debtors sent nine payments of $1,200.00 each to Debt Relief USA and quit making their monthly payments as instructed.  Debt Relief USA, however, did nothing to uphold its end of the agreement.  Debtors were sued three times by credit card companies after July of 2006.  Once the lawsuits were filed, Debtors realized that they could not get out from under their debt, and thus

filed for protection under the Bankruptcy Code.

The $3,400.00 receivable from Debt Relief USA added to Debtors' Schedule B on August 29, 2007, was done to reflect the amount that was refunded to Debtors by Debt Relief USA. Finally, Jerry testified that Debtors amended their Schedule B to reflect the value of Ann Marie's inheritance as soon as Debtors learned the amount. In fact, Jerry testified that Debtors had received the inheritance sometime within the ten-day period preceding the August 30, 2007, confirmation hearing date and that Debtors had not yet cashed the inheritance check.

## APPLICABLE LAW

It is well-established law in this Circuit that for a bankruptcy court to confirm a plan, "each of the requirements of section 1325 *must be present* and the debtor has the burden of proving that each element has been met." *In re Barnes*, 32 F.3d 405, 407 (9th Cir. 1994); *In re Andrews*, 49 F.3d 1404, 1408 (9th Cir. 1995); *Chinichian v. Campolongo*, 784 F.2d 1440, 1443-44 (9th Cir.1986) (citing *In re Elkind*, 11 B.R. 473, 476 (Bankr.D.Colo.1981)) (emphasis added). *See also, Ho. V. Dowell (In re Ho)*, 274 B.R. 867, 883 (9th Cir. BAP 2002) (under § 1325(a)(3), the debtor has the burden of proving good faith).

The Trustee asserts in his objection to confirmation that Debtors' Second Amended Chapter 13 Plan has not been filed in good faith as required by 11 U.S.C. § 1325(a)(3) which provides:

> [T]he court shall confirm a plan if – . . . (3) the plan has been proposed in good faith and not by any means forbidden by law[.]

The determination of whether a debtor filed a petition or plan in bad faith is left to the sound discretion of the bankruptcy court. *Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219, 1122-23 (9th

4

Cir. 1999); *In re Marsch*, 36 F.3d 825, 828 (9th Cir.1994); *Greatwood v. United States (In re Greatwood)*, 194 B.R. 637, 639 (9th Cir. BAP 1996), *aff'd,* 120 F.3d 268 (9th Cir.1997).

In considering whether Debtors have pursued actions in this case that warrant denial of confirmation of their Second Amended Chapter 13 Plan, the Court must review the "totality of the circumstances". *In re Leavitt*, 171 F.3d at 1124-25. *See also In re Nelson*, 343 B.R. 671 (9th Cir. BAP 2006) ("§ 1325(a)(3) 'good faith' . . ., under the law of the Ninth Circuit, is to be determined under the totality of the circumstances"). A finding of bad faith does not require fraudulent intent by the debtor. *Leavitt*, 171 F.3d at 1224; *Hungerford*, 19 Mont. B.R. at 130; *Gress*, 257 B.R. at 568.

In *Leavitt*, 171 F.3d at 1224, the Ninth Circuit held that in determining whether a chapter 13 petition plan was proposed in good faith, a bankruptcy court should consider: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. *See also Ho v. Dowell (In re Ho)*, 274 B.R. 867, 876 (9th Cir. BAP 2002). The Trustee, in his post-hearing Brief, urges the Court to consider the eleven specific factors discussed in *Fidelity & Cas. Co. v. Warren (In re Warren)*, 89 B.R. 87, 93 (9th Cir. BAP 1988). However, given later cautionary statements by the Bankruptcy Appellate Panel, the Court is reluctant to give much consideration to the *Warren* factors:

> [A note] of caution need[s] to be sounded regarding *Warren.* First, our narrow holding in *Warren* (to which we still adhere) was that § 1325(a)(3) "good faith" is independent of § 1325(b) "best efforts" and, under the law of the Ninth Circuit, is to be determined under the totality of the circumstances. *Warren,* 89 B.R. at 94-95, *citing Goeb v. Heid (In re Goeb),* 675 F.2d 1386, 1389-90 (9th

5

> Cir.1982).  As in this instance, however, *Warren* is often cited for an eleven-item laundry-list of "guidelines" indicative of good faith that it quoted from decisions of other circuits. That list, which the Ninth Circuit has not expressly adopted, needs to be understood as the beginning and not the end of the analysis.  The controlling Ninth Circuit analysis remains totality of the circumstances. *See Ho,* 274 B.R. at 876-77.  This appeal illustrates the problem with the *Warren* list. Although the bankruptcy court emphasized the existence of chapter 7 nondischargeable debt (which is listed in *Warren*), no reported decision of ours, or of the Ninth Circuit, has actually held that the presence of such debt suffices to deny plan confirmation.

*In re Nelson*, 343 B.R at 677, n.10.

## DISCUSSION

Turning to the four factors that this court "should consider" in its good faith analysis, as instructed in *Leavitt*, the first inquiry is whether Debtors have misrepresented facts in their petition or plan, unfairly manipulated the Code, or otherwise filed their petition or plan in an inequitable manner.  The evidence in this case shows, and this Court concludes, that Debtors have not misrepresented any facts in their petition or Second Amended Plan, have not manipulated the Bankruptcy Code and have not otherwise filed their petition or Second Amended Chapter 13 Plan in an inequitable manner.  Debtors amended their Schedule B as needed to reflect the facts as they came to Debtors' attention.  The Trustee also argues that Debtors failed to disclose their year to date income for 2007 in response to question 1 on the Statement of Financial Affairs.  While it certainly would behoove Debtors to answer all questions completely and accurately, such omission is really not of any consequence because Debtors provided such information when they filed their pay advices for the 6-month period preceding their May 24, 2007, petition date.

Next, it appears that this is the first bankruptcy petition filed by these Debtors.  Thus, unlike the debtor in *Leavitt*, these Debtors do not appear to have a history of bankruptcy filings.

Similarly, while Debtors admittedly filed their bankruptcy petition after three credit card companies obtained default judgments against Debtors, it does not appear that Debtors filed their bankruptcy petition to defeat any particular state court litigation. Finally, the Court does not see any identified egregious behavior on behalf of Debtors. Debtors explained that their credit card debt continually increased over a period of 15 years. Debtors sought to handle their credit card debt through Debt Relief USA and when that did not pan out as expected, Debtors turned to bankruptcy. The Court simply has not seen any behavior on behalf of these Debtors that the Court would consider egregious. Consequently, the Court finds that none of the *Leavitt* factors are applicable in this case.

The Trustee's primary argument with respect to his § 1325(a)(3) good faith objection is that Debtors are able to pay more per month, as reflected on their Schedules I and J, than is reflected in Debtors' Second Amended Chapter 13 Plan. Thus, although the Trustee has framed his objection as a "good faith" objection, his objection is in reality a disposable income objection. As the Court *in Nelson* observed, whether a plan has been proposed in good faith is independent of whether the "best efforts" test of § 1325(b) is satisfied. *Nelson*, 343 B.R. at 677 n.10. Although *Nelson* is a pre-BAPCPA case, the aforementioned comment is nevertheless instructive in cases such as this where the Trustee's good faith objection is premised almost exclusively on whether Debtors' Second Amended Chapter 13 Plan satisfies the requirements of § 1325(b). Two post-BAPCPA cases are further instructive and persuasive on this issue: *In re Austin*, 372 B.R. 668, 682-83 Bankr. D.Vt. 2007), and *In re Farrar-Johnson*, 353 B.R. 224, 231-32 (Bankr. N.D. Ill. 2006) (both cases have previously been cited by this Court – *Austin* in *In re Featherston*, 2007 WL 2898705, *10 (Bankr. D. Mont. Sept. 28, 2007), and *Farrar-Johnson* in

7

*In re Naslund*, 359 B.R. 781, 792 (Bankr. D. Mont. 2006) – for other purposes.  The Court in this case sets forth a lengthy excerpt from *Austin* that the Court finds particularly instructive.

> The Trustee also objects that the Debtors have not proposed their Plan in good faith because they continue to devote funds to the backhoe payment that should be devoted to the Plan. He argues that "[t]he strict mechanical application of the means test does not necessarily satisfy the debtor's burden of demonstrating good faith in the proposal of their plan, including whether they are devoting sufficient income to their plan," (doc. # 22, quoting *In re Edmunds,* 350 B.R. 636, 648-49 (Bankr.D.S.C.2006)), and urges the Court to "continue to use the information set forth in the [Debtors'] Schedules I and J to determine what good faith requires the debtor [to] commit to the Plan" (doc. # 22).
>
> The Debtors counter that, based on the means test, they are not obligated to pay any dividend to unsecured creditors, and hence their Plan to pay a 4% dividend to unsecured creditors actually constitutes an affirmative showing above what is necessary to establish good faith (doc. # 23 at 14-15).
>
> In scrutinizing the nexus between the amount of the plan payment and the good faith requirement of § 1325(a)(3), the Court finds the analysis articulated in *Farrar-Johnson* to be persuasive. In that case, the trustee had argued that the debtors' inflated expenses on Schedule J and their improper housing allowance deduction established a lack of good faith in the proposal of their plan. The *Farrar-Johnson* court rejected these arguments, positing that those kinds of "good faith objections to a debtor's disposable income ha[ve] had little or no potency" since the 1984 amendments to the Code which added § 1325(b) and the disposable income test. The court held that these amendments eliminated the good faith inquiry based on whether the plan proposed "'substantial or meaningful repayment to unsecured creditors.'" *Farrar-Johnson,* 353 B.R. at 231-32 (quoting *In re Smith,* 848 F.2d 813, 820 (7th Cir.1988)). The court explained
>
>> After 1984, a debtor's expenses were either "reasonably necessary" or they were not. If they were, and the plan was otherwise confirmable, it would "be confirmed even if it provide[d] for minimal (or no) payments" to unsecured creditors.... If that was true after 1984, it is *a fortiori* true after 2005, at least in the case of debtors with income above the median. For those debtors ... the determination of disposable income is now meant to be a simple and straightforward matter of arithmetic based on sections 707(b)(2)(A) and (B). Debtors may claim applicable expenses under the IRS National and Local Standards, and may also claim actual Other Necessary Expenses, without any judicial

> consideration of whether those expenses are in fact 'reasonably necessary'.

*Id.* at 232 (quoting *Smith,* 848 F.2d at 820 and citing 3 Keith M. Lundin, CHAPTER 13 BANKRUPTCY § 193.1 at 193-1 (3d ed.2006)). The court ultimately concluded:

> [i]f the reasonable necessity of a debtor's expenses is no longer relevant, then plainly the debtor's "good faith" in claiming them cannot be relevant. Disposable income is "determined under section 1325(b) rather than as an element of good faith under section 1325(a)(3)."

*Id.* quoting *Barr,* 341 B.R. at 186 and citing *Alexander,* 344 B.R. at 752.

Similarly, in its discussion of the connection between good faith and the amount of a chapter 13 Plan payment, *Collier on Bankruptcy* observes that the BAPCPA amendments to § 1325(b) emphasize that § 1325(b), not § 1325(a)(3), controls:

> Instead of simply looking at the debtor's actual income and expenses, these [2005] amendments in many cases attempt to create a bright line test to determine whether a debtor's plan is committing all disposable income. By creating a bright line test, Congress even more clearly indicated that it intended section 1325(b), rather than the good faith test, to be the measure of whether the debtor was committing sufficient income to the plan.

8 *Collier on Bankruptcy* ¶ 1325.08[1] (15th ed. rev.2005). *Accord* Marianne B. Culhane & Michaela M. White, *Catching Can-Pay Debtors: Is the Means Test the Only Way?,* 13 Am. Bankr.Inst. L.Rev. 665, 681 (2005).

> Persuaded by these interpretations of the good faith requirement for confirmation under the current statute, this Court concludes that post-BAPCPA, "[t]he disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan," *Farrar-Johnson,* 353 B.R. at 232. Since neither the record nor the Trustee's objection identify any factor other than the amount of the plan payment to support a finding that the Debtors' Plan fails to meet the good faith requirement, and there is no dispute that the Debtors properly computed the plan payment under the means test, the Court finds the Debtors' Plan may not be denied confirmation based upon the good faith plan requirement of § 1325(a)(3).

*Austin*, 372 B.R. at 682-683.

9

*Farrar-Johnson* further provides that:

> Had the debtors here claimed an improper housing expense on their Form B22C, the trustee's objection would thus have been that the proposed plan failed to comply with section 1325(b), not that the plan was proposed in bad faith. But the debtors claimed no improper expense, and so, the trustee having identified no other problem with the calculation on the form, the resulting disposable income figure must be accepted. Because these debtors have above-median income, moreover, the expenses on their Schedule J are irrelevant. But even if their income had been below the median, opening up their Schedule J to scrutiny, the trustee's objection would again have fallen under section 1325(b), not section 1325(a)(3). The disposable income a debtor decides to commit to his plan is not the measure of his good faith in proposing the plan.

*Farrar-Johnson,* 353 B.R. at 232.

As this Court has discussed on prior occasion, the disposable income test of § 1325(b) underwent substantial revision in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub. L. 109-8) ("BAPCPA").  BAPCPA was signed into law on April 20, 2005, and with certain exceptions, is applicable to cases commenced after October 16, 2005.  The instant bankruptcy case was commenced on May 24, 2007, and is thus clearly governed by the Bankruptcy Code, as amended by BAPCPA.

BAPCPA substantially modified the disposable income test of § 1325(b) in the following manner: (1) disposable income [current monthly income] is determined by the debtor's average monthly income received within the six-month period ending on the last day of the calendar month immediately preceding the date of the commencement of bankruptcy petition (*see* §§ 1325(b)(2) and 101(10A)); (2) for debtors with income above the applicable state's median income, amounts reasonably necessary to be expended are determined as the debtor's applicable monthly expense amounts specified under the IRS National and Local Standards and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses for the area in

10

which the debtor resides on the date of filing (*see* §§ 1325(b)(3) and 707(b)(2)(A) and (B)); and (3) projected disposable income, multiplied by the applicable commitment period is the amount to be paid to unsecured creditors, §§ 1325(b)(1)(B) and 1325(b)(4)(B).

      Congress defined the term "current monthly income" ("CMI"), as set forth in § 1325(b)(2) at § 101(10A) as the average monthly income from all sources, with some exceptions, that the debtor receives during the 6-month period ending on the last day of the calendar month immediately preceding the date of the commencement of debtor's bankruptcy case. CMI excludes Social Security benefits or payments to victims of war crimes, of crimes against humanity or terrorism, and in the context of a chapter 13 bankruptcy (*see* § 101(10A)(B)), also excludes alimony, child support, foster care, and child disability payments (§ 1325(b)(2)). CMI is calculated by having all debtors complete lines 1-23 of Form 22C, with the result being listed on line 21 as the debtor's "[a]nnualized current monthly income for § 1325(b)(3)." The term "disposable income" is defined at § 1325(b)(2) and is determined differently depending on whether the debtor's income is above or below the applicable median family income as determined by the debtor's place of residence and household size. If a debtor's annualized current monthly income, as set forth on Line 21 of Form 22C, is greater than the applicable state's median income for a household of the same size, reasonably necessary expenses are calculated using the "Means Test" of § 707(b)(2)(A) and (B). However, if a debtor's annualized current monthly income is less than the state's applicable median income, the debtor is finished with Form 22C and proceeds to list income and expenses on Schedules I and J.

      The Trustee and Debtors agree that Debtors' income is above Montana's median income, whether it be for a family of two or a family of four. Thus, Debtors' disposable income is, by

statute, determined by Form 22C and not Debtors' Schedules I and J.  Clearly, if this case were a pre-BAPCPA case, Debtors' monthly plan payment would have to be $1,321.73 to pass muster.  However, post-BAPCPA, the adequacy of these Debtors' plan payments is determined by Form 22C.

The Trustee maintained at the hearing that Debtors should not be able to claim that their household size is 4.  The Court agrees.  Jerry conceded that Debtors only claimed an exemption for one of their children on Debtors' 2006 income tax return and further conceded that neither of the boys now live with Debtors.  The evidence is not clear, but it appears that the younger son was living with Debtors at the end of 2006 and the Court can only presume that the younger son was also living with Debtors when they filed their bankruptcy petition on May 24, 2007.  Thus, the Court will allow Debtors to claim their family size as 3, rather than 4.  The difference in Debtors' household size appears to increase Debtors' monthly disposable income from $333.92 per month to approximately $531.02 per month on line 58 of Form 22C [$531.02 times 60 months generates $31,861.20].  Debtors' Second Amended Chapter 13 Plan provides for monthly payments of $550.00 [$550 times 60 months generates $33,000].  The difference between the aggregate generated by the two different monthly payments is $1,138.80.  Debtors propose to pay an impaired secured creditor its unpaid debt of $6,500 plus interest at 8% per annum from the monthly payments.  Debtors' proposed plan fails to satisfy § 1325(b)(1)(B) as Debtors will not pay all of their projected disposable income received during the applicable commitment period to the unsecured creditors.  Debtor also must provide an add-on to their monthly payment for the trustee's fee determined at line 50.  *See In re McDonald*, 361 B.R. 527, 531 (Bankr. D. Mont. 2006).

The next item of contention raised by the Trustee is Ann Marie's postpetition receipt of a $10,000.00 inheritance from her aunt's estate. In a recent Memorandum of Decision entered by this Court in *In re Wiegand*, Case No. 07-60620, on October 9, 2007, the Court noted that several sections of the Internal Revenue Code ("IRC") provide guidance in determining income. "Income" under the Internal Revenue Code is the subject of numerous statutes, and case law construing the term.

Section 61(a) of Title 26, U.S.C., generally defines gross income. *See* § 61(a)(1) through 61(a)(15). Section 61(b) specifically provides: "For items specifically included in gross income, see part II (sec. 71 and following). For items specifically excluded from gross income, see part III (sec. 101 and following)." According to 26 U.S.C. § 102(a), gross income generally "does not include the value of property acquired by gift, bequest, devise, or inheritance."[1] Given the foregoing, the Court finds that Ann Marie's inheritance would not fall under the catchall provision of Debtors' Second Amended Chapter 13 Plan that submits all "future earnings and other income of the Debtors" to the supervision and control of the Trustee.

Rather, Debtors have appropriately listed the $10,000.00 inheritance as a nonexempt asset of the bankruptcy estate. As such, the inheritance factors into the confirmation process under the best interests of creditors test found at 11 U.S.C. § 1325(a)(4). The above analysis is equally applicable with respect to the refund of $3,400.00 that Debtors received from Debt Relief USA.[2]

---

[1] However, under § 102(b), "Subsection (a) shall not exclude from gross income – (1) the income from any property referred to in subsection (a); or (2) where the gift, bequest, devise, or inheritance is of income from property, the amount of such income."

[2] According to Jerry's testimony, it appears that Debtors paid Debt Relief USA a total of $10,800.00. If Debtors have received a refund of $3,400.00, there are still remaining funds paid of $7,400.00. The Trustee indicated at the confirmation hearing that he may be seeking the

However, the Court would note that Debtors did amend their Schedule B on August 29, 2007, to increase the value of their AMERIPRISE/IRA and TSC to $8,999.09. Debtors have not amended their Schedule C wherein Debtors claim an exemption of $4,854.34 in the asset described as AMERIPRISE/IRA and TSC.[3] Thus, an additional $4,144.75 factors into the analysis under § 1325(a)(4).

Paragraph 2(f) of Debtors' Second Amended Chapter 13 Plan provides that the "total amount distributed under paragraphs 2.(d) and (e) will be at least $13,400.00 which exceeds what would be available to pay unsecured claims if the Debtors' estate was liquidated under Chapter 7 of the Bankruptcy Code." Debtors' liquidation analysis accounts for Ann Marie's inheritance and the $3,400.00 refund from Debt Relief USA, but fails to account for the portion of the AMERIPRISE/IRA and TSC that was not claimed as exempt. Therefore, the Court cannot confirm Debtors' Second Amended Chapter 13 Plan; not because the Plan was proposed in bad faith under 11 U.S.C. § 1325(a)(3), but because the Plan fails to satisfy the requirements of § 1325(a)(4).

IT IS THEREFORE ORDERED that the Court will enter a separate order denying confirmation of Debtors' Second Amended Chapter 13 Plan; directing Debtors to file a further amended Chapter 13 plan within ten (10) days; and resetting the hearing on confirmation of Debtors' further amended Chapter 13 plan for **Thursday, November 8, 2007, at 09:00 a.m.**, or as soon thereafter as the parties can be heard, in the 5TH FLOOR COURTROOM, FEDERAL

---

return of such funds. The additional $7,400.00 is not listed as a receivable in Debtors' Schedule B.

[3] Mont. Code Ann. § 25-13-608(1)(e) or § 31-2-106(3) may be applicable.

BUILDING, 316 NORTH 26TH, BILLINGS, MONTANA.

BY THE COURT

*/s/ Ralph B. Kirscher*
HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

15